IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03315-MEH

NICHOLAS M. MONTOYA,

     Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

     Defendant.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff Nicholas M. Montoya appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433 and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of the appeal. After consideration of the parties' briefs and the administrative record, the Court affirms the ALJ's decision.

## BACKGROUND

### I.    Procedural History

     Plaintiff seeks judicial review of the Commissioner's decision denying his applications for DIB filed on February 5, 2016 and for SSI filed on May 23, 2017. Administrative Record ("AR") 143–151. After the DIB application was denied on April 8, 2016 (AR 84–86), an Administrative

Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for December 21, 2017 (AR 103–131), at which Plaintiff was represented by counsel, and the Plaintiff and a vocational expert testified. AR 30–63. The ALJ issued a written ruling on March 21, 2018 finding Plaintiff was not disabled starting on October 20, 2015 because, considering Plaintiff's age, experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. AR 14–24. On January 5, 2019, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. AR 3–5. *See* 20 C.F.R. § 404.981. After his request for extension of time was granted, Plaintiff timely filed his Complaint and Petition for Review with this.

## II.      Plaintiff's Alleged Conditions

Plaintiff was born on June 7, 1973; he filed his application for DIB in August 2016 and his application for SSI on in January 2018. AR 157–168. Plaintiff claims he became disabled on April 1, 2012 (AR 157) and reported that he was limited in his ability to work due to thoracic outlet syndrome, diabetes, cirrhosis, bursitis, degenerative disc disease, rheumatoid arthritis, and psoriasis. AR 188. No party disputes that Plaintiff's "date last insured" for purposes of social security benefits was March 31, 2018; thus, the Plaintiff must establish a "disability" on or before that date to be entitled to a period of DIB and SSI. In describing Plaintiff's medical history, the Court will focus primarily on those records cited by the parties and the ALJ in this case.

On November 12, 2014, Plaintiff presented to Southern Colorado Clinic, P.C. ("Southern Colorado") for follow-up treatment concerning his diabetes and with complaints of right shoulder pain. AR 345. Nurse Practitioner Amanda C. Fadenrecht ("NP Fadenrecht") noted that Plaintiff's pain was due to a lump on top of his shoulder. *Id.*

On December 18, 2014, Plaintiff was again seen at Southern Colorado for his shoulder pain and lump. An MRI of his chest was conducted, showing the lump to be "asymmetric, subcutaneous fat . . . [or a] small lipoma." AR 378. The MRI scan also identified "[d]eformity of the right shoulder" with a labrum tear. *Id.* An MRI of the shoulder was recommended for further assessment. *Id.* On January 2, 2015, Plaintiff returned to Southern Colorado and was seen by NP Fadenrecht. AR 379. NP Fadenrecht noted that the MRI showed a "possible lipoma" (AR 379) but found Plaintiff to have "full range of motion of all joints." AR 380. Plaintiff continued to see NP Fadenrecht through May 2016 for issues including diabetes (AR 387, 426, 434, 444), psoriasis (AR 398, 405, 412, 415), shoulder pain (AR 453), and hand numbness (AR 453).

On April 6, 2016, Plaintiff returned to Southern Colorado, complaining of shoulder pain and the lump on his shoulder. AR 468. Returning again to Southern Colorado on April 20, 2016, Plaintiff received bilateral shoulder injections for continuing pain in both shoulders. AR 475–79. On May 13, 2016, Plaintiff had an MRI of his right shoulder at Parkwest Imaging Center that showed superior labral tearing and tearing extending posteriorly to six o'clock, marked hypertrophy of the posterior labrum with a hypoplastic glenoid, moderate supraspinatus and infraspinatus tendinopathy in the rotator cuff, and marked downsloping of the acromion. AR 301.

On May 23, 2016, Plaintiff presented to the Hanson Clinic and was seen by Charles Hanson, M.D. AR 716. Upon examination, Dr. Hanson found the mass on Plaintiff's shoulder, slight subacromial crepitation in the right shoulder, and minor discomfort from resistance movement. AR 718. Dr. Hanson reviewed Plaintiff's MRI and ordered another MRI of the right supraclavicular area with contrast. AR 719. If the new MRI did not show any contraindications, Dr. Hanson advised Plaintiff that right shoulder surgery would include decompression, exploration of the rotator cuff, and possibly rotator cuff repair. *Id.*

On June 19, 2016, Plaintiff went to the emergency room with neck pain.  AR 508.  The treating physician noted that Plaintiff had normal function of the bicep, tricep, and could perform normal activities with the right arm but with some associated pain.  AR 511.  On June 23, 2016, a CT scan of Plaintiff's chest was taken, showing hypoplastic right first rib with pseudoarticulation to the second rib and narrowing of the space between the right clavicle and first and second ribs.  AR 745.

On July 12, 2016, Michael O'Neill, M.D. began providing primary medical care to Plaintiff.  AR 751–752.  Dr. O'Neill's diagnoses of Plaintiff included psoriatic arthritis mutilans, thoracic outlet syndrome, plaque psoriasis in the feet, and chronic back pain.  AR 750–751.  On August 2, 2016, Plaintiff returned to Dr. O'Neill with complaints of inflamed feet, which Dr. O'Neill characterized as chronic pustular psoriasis.  AR 754.  Dr. O'Neill discontinued Plaintiff's prescription of Augmentin.  *Id.*

On August 25, 2016, Stephen Annest, M.D. of Vascular Institute of the Rockies evaluated Plaintiff  for neck, shoulder, and arm pain.  AR 739.  He observed that Plaintiff had abnormal range of motion in his shoulder but good strength.  AR 740.  On September 16, 2016, Plaintiff followed up with Dr. O'Neill, who opined in a letter that Plaintiff is "certainly incapable of engaging in his usual occupation [of] construction" and "is not capable of sedentary work."  AR 747.  When examining Plaintiff, Dr. O'Neill noted that the soles of his feet were erythematous, and his shins and hands had "some silvery scale[s]."  AR 754.  Plaintiff returned to see Dr. O'Neill on September 28, 2016 for "a flare of his shoulder pain."  AR 786.  Plaintiff had not been able to start physical therapy by then.  *Id.*  Upon examination, Dr. O'Neill found Plaintiff's neck to be "[v]ery tender" with some swelling and with "abduction and flexion limited to 90 degrees."  AR 787.

4

On October 11, 2016, Plaintiff presented to Advanced Neurological Evaluation and Treatment Center and was seen by Alexander Feldman, M.D. AR 829. Plaintiff was seen for an upper extremity EMG regarding his right arm pain. *Id.* The EMG showed evidence of thoracic outlet syndrome on the right shoulder and "[b]ilateral carpal tunnel syndrome." AR 840. Upon examination, Dr. Feldman found the mass in the medial portion of the right clavicle and noted that the tests for thoracic outlet syndrome (Adson's, Wright's, and Roos) were all positive. AR 830.

On October 27, 2016, Plaintiff returned for a follow-up visit with Dr. O'Neill for his thoracic outlet syndrome. AR 788. Dr. O'Neill examined Plaintiff and found "[s]light, suprsclavicular [sic] swelling," tenderness on the right side of Plaintiff's neck, and "slight diffuse weakness." AR 789. On November 28, 2016, Plaintiff reported to Dr. O'Neill that "his thoracic surgeon wants him to first do a course of physical [therapy] before proceeding with surgery." AR 790. The "thoracic surgeon" also advised Plaintiff to go see an orthopedist. *Id.* After an examination, Dr. O'Neill noted Plaintiff's psoriasis on his hands, elbows, and legs and found "[m]arkedly limited ROM in right shoulder with positive Neer and Hawking [tests]." AR 791. Around two weeks after seeing Dr. O'Neill, Plaintiff presented to the emergency room, with bilateral foot pain. AR 940. The treating physician noted that there was no evidence Plaintiff used any opiates, but he admitted to the physician that he used methamphetamines. *Id.* The physician believed Plaintiff's foot pain stemmed from a fungal infection "rather than acute psoriasis," prescribed an antibiotic, and encouraged Plaintiff to stop using methamphetamines. *Id.*

On December 26, 2016, Plaintiff returned to Dr. O'Neill, seeking a refill on Oxycodone. AR 792. Plaintiff indicated that he had made an appointment with Dr. O'Neill's "orthopedic referral." *Id.* Upon examination, Dr. O'Neill noted Plaintiff's right shoulder "[l]ags full abduction and flexion by 50 degrees." AR 793.

From January 2017 to February 2018, Plaintiff continued to see Dr. O'Neill, once a month, for his shoulder pain and psoriasis. *See, e.g.*, AR 794, 800, 871. While always reduced, Plaintiff's reduction in his range of motion in the right shoulder varied between being able to reach above his shoulder (AR 795, 872) to being "markedly" limited (AR 799, 801, 803, 864, 866, 868, 870, 874). In that same timeframe, Plaintiff weekly use of Humira to treat his psoriasis brought it "under good control." AR 877. In January 2018, Dr. O'Neill drafted a letter for Plaintiff, opining that Plaintiff's shoulder surgery would require "at least 8 weeks of recovery, during which time he cannot work and will not be able to use his shoulder." AR 851. Dr. O'Neill also recommended that if Plaintiff proceeded with thoracic surgery, there would "be a long 3–6 months recovery period." *Id.* Dr. O'Neill concluded his letter, contending that Plaintiff "is now certainly incapable of engaging in his usual occupation, construction[,]" and "that he is not capable of sedentary work," given his "psoriatic arthritis and constant pain." *Id.*

In June 2017, Plaintiff saw R. Terry Jones, M.D. for a consultative psychiatric evaluation, as a request from Disability Determination Services. AR 810. Dr. Jones reviewed Plaintiff's medical and psychiatric records. *Id.* Dr. Jones observed that Plaintiff "obviously [has] a significant issue with his chronic pain," because "[h]e was demonstrating a lot of discomfort." *Id.* Plaintiff reported to Dr. Jones that he has difficulty concentrating "for extended periods of time when he is having significant pain." AR 812. Dr. Jones diagnosed Plaintiff with "Somatic symptom disorder with medical and psychological factors present, chronic, [and] severe" and "Adjustment disorder with depression and anxiety, chronic moderate, secondary to his chronic pain disorder." AR 813. Following his evaluation, Dr. Jones opined that sustained effort in concentrating for Plaintiff "would be a problem when having significant pain," and Plaintiff "could

probably complete a normal workday without interruptions from his psychiatric condition, but his chronic pain disorder would present significant issues."  AR 814.

On February 28, 2018, Plaintiff went to San Luis Valley Health to see Carissa Tripi, D.O., an orthopedic surgeon.  AR 854.  On examination, Plaintiff had a ninety-degree range of motion in his right shoulder, and an x-ray showed "significant end-stage arthritis of the glenohumeral joint with cystic formation."  AR 893.  Dr. Tripi told Plaintiff "that the majority of his problem is coming from the shoulder joint itself and not a mass involving the nerve or his thoracic outlet syndrome." *Id.*  She diagnosed Plaintiff with "[j]uvenile rheumatoid arthritis of right shoulder" and recommended an MRI of the shoulder.  *Id.*  On March 5, 2018, the MRI was done; it showed, in part, "a shallow partial-width articular surface tear involving the junctional supraspinatus-infraspinatus tendon fibers along with mild tendinosis."  AR 857.  Dr. Tripi reviewed the MRI results with Plaintiff on March 7, 2018 and discussed total shoulder replacement surgery.  AR 897.  She told Plaintiff that she did not "think this [would] be his last shoulder surgery given his young age and the degree of his rheumatoid arthritis."  *Id.*  Plaintiff told Dr. Tripi that he wanted to have the surgery "after he finish[ed] a job which he [thought] may be in April or so."  *Id.*

## III.    Hearing Testimony

At the hearing on December 13, 2018, Plaintiff (who appeared with counsel) and a vocational expert ("VE"), Nora Dunne, testified.  AR 35–72.  After confirming with Plaintiff's counsel that there were no objections to the exhibits currently in the file, admitting a recent letter from Dr. O'Neal as an exhibit, and waiving a reading of the issues in the case (AR 36–38), the ALJ proceeded to question the Plaintiff, who testified that he had worked for about a year as a "paint shop crew supervisor," painting commercial buildings; for another year, Plaintiff testified that he worked as a brake press operator, building wheelchairs; for another two to two and a half

years, he worked as a laborer for Carpet Flooring Specialists; for a few years, Plaintiff also worked as a landscape laborer, doing lawn maintenance and snow removal.  AR 39–41.

In response to his attorney's questions, Plaintiff testified that he had pain from his "whole neck all the way down to" his arms, such that his arms would "go numb"; he had difficulty lifting things depending on his pain level on any given day, including a gallon of milk; his pain caused him to hurt either laying down or sitting for too long; his right arm and shoulder are always in pain, and medication only helps "for a little bit;" he must get up and stand more frequently, because of lumps and swelling in his legs and feet; he experienced discoloration near the lumps on his legs and groin; he testified that an MRI showed he had a nodule in his lung, lumps next to his bladder, in his triceps, in his clavicle, and on his bicep; he wanted to get his lumps biopsied, but alleged that no doctor who accepts Medicaid would do the procedure; due to the lump near his triceps, he has had to hold off on surgery to his shoulder; his psoriatic arthritis caused his fingers to twist and all of his joints to hurt; he has psoriasis "all over [his[ body, causing pain when he stands too long and his feet "crack"; he recently changed his medication to help with the psoriatic arthritis and for his diabetes; he could probably bend at the waist to pick something up, but he could not kneel or squat due to "big patches of the plaque psoriasis" on his knees; he cannot reach with his right arm; he finds it difficult to hold things when his arms go numb and start to tingle, including getting dressed; he has been able to climb stairs, but has had problems with getting dizzy, including passing out a few times; he was able to drive; he cannot go out to movies or be in bowling leagues due to his pain; he has "degenerative back disease" which causes him pain when lifting; he had a fatty liver; he had carpal tunnel syndrome as well.  AR 44–59.

The ALJ proceeded to ask Plaintiff questions, to which Plaintiff responded that he initially attempted to file for benefits in 2015 but was told that his paperwork was lost; he had recently tried

to work by helping his cousin do plumbing work; and he has worked his entire life, but his pain has prevented him from being able to continue.  AR 59–63.

The ALJ then turned to the VE, Ms. Dunne,[1] who had listened to Plaintiff's testimony and testified that an individual with Plaintiff's age, experience and education and the following limitations — "occasionally carrying 20 pounds, frequently carrying 10 pounds, stand and/or walk for six hours of an eight hour workday, sit for six hours of an eight hour workday, can never crawl or climb ladders, ropes or scaffolds, can frequently stoop, kneel, crouch or climb ramps and stairs, can occasionally reach overhead and frequently reach in all other directions with the dominant right upper extremity, can frequently reach with the left upper extremity, can frequently handle, finger or feel with the bilateral upper extremities, can have no more than occasional exposure to direct sunlight, and can have no exposure to hazards including unprotected heights or operating heavy machinery" — could not perform his previous jobs of brake press operator, carpet layer operator or landscape laborer but could perform the jobs of "furniture rental consultant," "cashier II," and  "routing clerk."  AR 65–66.

Ms. Dunne further testified that an individual with Plaintiff's age, experience and education and the following limitations — "occasionally carrying 20 pounds, and frequent lifting carrying 10 pounds . . . can stand and/or walk for no more than four hours of an eight hour workday, can sit for six hours of an eight hour workday, can only occasionally operate foot controls with the bilateral lower extremities, can also never crawl or climb ladders, ropes or scaffolds, can occasionally stoop, kneel, crouch or climb ramps and stairs, can never reach overhead and frequently reach in all other directions with the dominant right upper extremity, can frequently reach in all directions with the left upper extremity, can also frequently handle, finger and feel

---

[1]Plaintiff did not object to the VE's qualifications to testify.  AR 64.

with the bilateral upper extremities, . . . can also have no more than occasional exposure to direct sunlight and no exposure to hazards including unprotected heights or operating heavy machinery" — could perform the jobs of "furniture rental consultant," "cashier II," and  "routing clerk" as well.  AR 67–68.  If the limitations were further restricted such that the "individual can still never reach overhead with the right upper extremity but could only occasionally reach, handle, finger, and feel with the bilateral upper extremities to the extent that [does not] include overhead reaching with the right upper extremity," the "only job that would survive would be the furniture rental" job.  AR 68.  If the limitations were further restricted to being "off task more than ten percent of the workday," all employment would be eliminated.  AR 69.  To conclude the hearing, Plaintiff's counsel only asked the VE to repeat the full DOT number for the carpet layer helper.  AR 63.

The ALJ issued an unfavorable decision on February 21, 2019.  AR 11–26.

## LEGAL STANDARDS

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(i), 423, 1382.

## I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months."  42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step Four then requires Plaintiff to show his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work he has performed in the past.  If the claimant is able to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).  Finally, if the claimant establishes a prima facie case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.   Standard of Review

The Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether

the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted).  In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).  But, in all cases, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## ALJ's RULING

The ALJ ruled that Plaintiff did not engage in substantial gainful activity since April 1, 2012 (Step One).  AR 15.  Further, the ALJ determined that Plaintiff had the following severe impairments: psoriasis with psoriatic arthritis mutilans; rotator cuff tendinopathy, mild acromioclavicular osteoarthritis, and juvenile rheumatoid arthritis of the right shoulder; mild degenerative disc disease of the thoracic and lumbar spine; degenerative disc disease of the cervical spine; thoracic outlet syndrome; bilateral carpal tunnel syndrome; mild degenerative joint disease and tennis elbow of the left elbow; and obesity (Step Two).  *Id.*  He found Plaintiff's other medically determinable impairments, including diabetes mellitus, lentigines, benign nevi, solar elastosis, ingrown toenail, eczema, hematospermia, iliofemoral sprain, hypertension, opioid

dependence, methamphetamine abuse, cellulitis, fungal infection, and tinea versicolor were "non-severe." *Id*. The ALJ also found Plaintiff's abdominal muscle strain, left hip pain, neuropathy, right trapezius spasm, left shoulder pain, and left biceps rupture were not medically determinable impairments. AR 18. Next, the ALJ found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). AR 18–19.

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC")

to perform a reduced range of light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) in that the [Plaintiff] can only occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. [Plaintiff] can occasionally operate foot controls with the bilateral lower extremities. He can never crawl or climb ladders, ropes, or scaffolds, but he can occasionally stoop, kneel, crouch, or climb ramps and stairs. The [Plaintiff] can never reach overhead with the right upper extremity but can frequently reach in all other directions. He can frequently reach in all directions with the left upper extremity. He can frequently handle, finger, and feel with the bilateral upper extremities. He can have no more than occasional exposure to sunlight, and he can have no exposure to hazards, including unprotected heights or operating heavy machinery.

AR 19. Based on the RFC, the ALJ found that Plaintiff could perform no past relevant work (Step Four), but there were jobs in the national economy that Plaintiff could perform, such as "furniture rental consultant," "cashier II," and  "routing clerk." AR 23–25. As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. AR 25–26.

## ISSUES ON APPEAL

Plaintiff seeks relief in the form of a finding "that Plaintiff is entitled to DIB and SSI benefits." ECF 1 at 2. On appeal, the Court is authorized solely to review whether the ALJ's decision is supported by substantial evidence in the record as a whole and whether the ALJ applied the correct legal standards. *Williamson*, 350 F.3d at 1098; *White*, 287 F.3d at 905. As described

in Plaintiff's opening brief, he alleges the following errors: (1) whether the ALJ failed to properly evaluate the medical evidence and medical source opinions as required by 20 C.F.R. §§ 404.1527, 416.927; (2) whether the ALJ's decision failed to show proper evaluation of Plaintiff's subjective allegations as described in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987); and (3) whether the Step Five burden was met.

## ANALYSIS

### I.     ALJ Properly Evaluated Medical Evidence and Source Opinions

Plaintiff argues the ALJ "violated the requirements of 20 C.F.R. §§ 404.1527 and 416.927" in failing to correctly evaluate medical opinion evidence. Op. Brief at 11. Plaintiff urges the Court to find error on two grounds. First, the ALJ failed to give the opinion of Dr. O'Neill controlling weight. *Id.* Second, the ALJ improperly relied on the opinion of Dr. Suyeishi, rather than Dr. Jones. *Id.* at 14–15.

In weighing medical source opinions, 20 C.F.R. § 404.1527(c)(1) states, "Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." That regulation also provides additional factors that the ALJ must consider. 20 C.F.R. § 404.1527(c). There is no requirement, though, mandating "an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, an ALJ must only provide "good reasons in his decision for the weight he gave to the treating sources' opinions." *Id.*

#### A.     Dr. O'Neill's Opinion

"[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each of which is analytically distinct." *Krauser v. Astrue*,

638 F.3d 1324, 1330 (10th Cir. 2011).  "The initial determination the ALJ must make with respect to a treating physician's medical opinion is whether it is conclusive, *i.e.*, is to be accorded 'controlling weight,' on the matter to which it relates."  *Id.*  The ALJ must give such an opinion "controlling weight if it is well-support by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Id.*  "If the opinion is deficient in either of these respects, it is not entitled to controlling weight."  *Id.*  As to the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright)."  *Id.*

Plaintiff's first argument concerning Dr. O'Neill is that the ALJ failed "to assess whether Dr. O'Neill's opinion as a treating physician was entitled to controlling weight."  Op. Brief at 11. As a preliminary matter, the ALJ gave "little weight to the opinions of Dr. O'Neill."  AR 22.  It is implicit in the ALJ's statement that he did not give "controlling weight" to Dr. O'Neill's opinions. *See Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014) (although ALJ did not expressly state whether he gave treating physician's opinion "controlling weight," the ALJ "implicitly declined to give the opinion controlling weight").  Because the Court determines that the ALJ implicitly did not give "controlling weight," the Court finds no error with the ALJ not expressly stating he was rejecting "controlling weight."  *See id.* ("[W]e can tell from the decision that the ALJ declined to give controlling weight to [treating physician's] opinion, [so] we will not reverse on this ground.").

Second, Plaintiff challenges the ALJ's decision, because "[t]he medical record . . . shows that the longitudinal record, and the documentation of all of [his] impairment amply supported Dr. O'Neill's opinion."  Op. Brief at 12.  In other words, Plaintiff asserts that Dr. O'Neill's opinions needed to be given controlling weight, because they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial

evidence in the record." *Id.* (quoting *Krauser*, 638 F.3d at 1330). Defendant responds that Dr. O'Neill's opinions were on issues reserved for the Commissioner, and thus not entitled to controlling weight.

"Opinions on some issues . . . are not medical opinions," such as "medical sources . . . to provide evidence[] . . . on . . . residual functional capacity." 20 C.F.R. § 404.1527(d)(2). These types of medical source opinions are "reserved to the Commissioner." *Id.* Dr. O'Neill opined that Plaintiff could not return to his past work and that he was unable to perform sedentary work. AR 747, 751. Those opinions speak directly to Plaintiff's "residual functional capacity" and are not entitled to controlling weight. 20 C.F.R. § 404.1527(d)(3); s*ee Titles II & XVI: Med. Source Opinions on Issues Reserved to the Comm'r*, SSR 96-5P (S.S.A. July 2, 1996) ("However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

Even if Dr. O'Neill's opinions were not on issues reserved for the Commissioner, the ALJ acted properly in giving them little weight. The ALJ noted that Dr. O'Neill gave conflicting opinions in claiming that Plaintiff could not perform sedentary work in 2016 and 2018 but opining that he was limited only to not engaging in heavy lifting in 2017. AR 22. In fact, the ALJ found that Dr. O'Neill's September 2016 opinion was inconsistent with the treatment notes of the same day, in which he noted Plaintiff's psoriatic outbreak was "much better." *Id.* Also, the ALJ found inconsistencies between Dr. O'Neill's opinions and the examination notes stating Plaintiff had full range of motion in his shoulder and had normal muscle strength. *Id.* These inconsistencies included later treatment notes by Dr. O'Neill, observing that Plaintiff was doing well on his medication regimen. AR 22–23. Finally, the ALJ noted the inconsistency in Plaintiff reporting to Dr. O'Neill that he "was working at higher exertional levels than opined by Dr. O'Neill." AR 23.

As detailed in the ALJ's decision, these "higher exertional levels" occurred when Plaintiff worked as "a maintenance tech, full time," (AR 829), helped someone move (AR 798), assisted a cousin with plumbing work (AR 871), and "remain[ed] active in construction" (AR 875). For those reasons, the ALJ gave little (but not no) weight to Dr. O'Neill's opinion.

Plaintiff contends that the ALJ improperly failed to consider the opinions of NP Fadenrecht in determining what weight to give Dr. O'Neill's opinions. Op. Brief at 13. The Court notes that the ALJ did not reject NP Fadenrecht's opinions as suggested by Plaintiff; instead, the ALJ gave them little weight. AR 22. The ALJ found NP Fadenrecht's opinions "vague as to the maximum functional abilities of the claimant with the right upper extremity and the duration for such limitations." *Id.* Moreover, the ALJ found the opinions to be inconsistent with both the observations in August 2016 that Plaintiff had good strength in his shoulders and the "conservative, medication based treatment of the claimant's impairments." *Id.*

An ALJ may properly disregard (or give little weight) to a treating physician's opinion when there are inconsistencies in them over time, without intervening physical changes in Plaintiff. *White v. Barnhart*, 287 F.3d 903, 907–908 (10th Cir. 2001). Further, treating physician's opinions that are inconsistent with that physician's treatment notes may be disregarded by an ALJ. *Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013). In this case, the ALJ provided "good reasons" for weighing the opinions of Dr. O'Neill and NP Fadenrecht as he did. *Oldham*, 509 F.3d at 1258. The ALJ did not refuse to consider the opinions; rather, he outlined the inconsistencies in the opinions and gave them a reduced weight. The Court finds that the ALJ was justified in doing so, based on the "substantial support" in the record for the decision. *White*, 287 F.3d at 908.

B.    Opinions of Dr. Jones and Dr. Suyeishi

Plaintiff argues that the ALJ improperly disregarded the opinion of Dr. Jones and gave too much weight to Dr. Suyeishi's opinion.  Op. Brief at 14–17.  Specifically, Plaintiff challenges the ALJ's reliance on Dr. Suyeishi's opinion, because "the record indicates that Dr. Suyeishi did not actually prepare the opinion himself."  Mot. at 15.

The ALJ did not completely disregard Dr. Jones' opinion; rather, he gave it "little weight." AR 16.  The ALJ noted that Dr. Jones' opinion that Plaintiff was limited to only simple and repetitive tasks was not supported by his own testing, "including that the claimant was able to recall three of three words immediately and after a delay and that he claimant's concentration was good and the claimant was able to perform serial threes."  *Id.*  The ALJ also gave less weight to the remainder of Dr. Jones' opinion, because "it is speculative and based [on] the claimant's reported physical impairments, . . . which is outside of Dr. Jones' specialty."  AR 16.  In finding inconsistencies, the ALJ has the discretion not to give controlling weight to an opinion, even from a treating physician.  *Gonzales v. Colvin*, 515 F. App'x 716, 719 (10th Cir. 2013) (affirming ALJ's decision not to give controlling weight when "ALJ reasonably found the evidence inconsistent with [the] opinion").

Plaintiff argues that "[t]he transmittal forms included in the unexhibited portion of the electronic case file, and that are ordinarily kept out of the Administrative record[,] . . . indisputably show that [Dr. Suyeishi's] opinion was entirely the work product of state agency disability examiner Ryan Gleason."  Op. Brief at 16.  Plaintiff cites to POMS DI 24510.060 for the proposition that for "decisions that are not fully favorable, only a psychiatrist or psychologist is to perform the analysis and decided the mental functional capacity."  *Id.* (quoting POMS DI 24510.060A.2.a).  However, that provision concerns the form for evaluating "Mental Residual

Functional Capacity Assessment." POMS DI 24510.060. The form at issue in this case is the Psychiatric Review Technique Form ("PRTF"). AR 260–61. The applicable provision for the PRTF states that "[t]he medical or psychological consultant (MC or PC) has overall responsibility for assessing medical severity. The disability examiner may assist in preparing the PRTF[,]" provided that "MC or PC . . review[s] and sign[s] the document." POMS DI 24583.005G.1. Here, Dr. Suyeishi indicated that he reviewed the case and affixed his signature on the form. AR 261. The Court thus finds no error in the way the form was prepared.

In his reply, Plaintiff contends that "the state agency disability examiner who prepared the form for the doctor's signature misstated Dr. Jones' findings." Reply at 4. This is a novel argument that Plaintiff did not raise in his opening brief. It would likely be improper for the Court to consider this argument without giving Defendant an opportunity to respond. *O'Connell v. Alejo*, 18-cv-01359-RBJ, 2020 WL 3268755, at *3 (D. Colo. June 17, 2020) ("Consideration by the Court of issues raised for the first time in a reply brief 'robs the [other party] of the opportunity to demonstrate that the record does not support [the moving party's] factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result.'" (quoting *Hubbard v. Nestor*, 16-cv-00444-CMA-STV, 2019 WL 339823, at *1 (D. Colo. Jan. 25, 2019))). However, even if the Court were to consider the argument, any error would likely be harmless, since substantial evidence supported the ALJ's conclusion. *See Allen v. Barnhart*, 35 F.3d 1140, 1145, (10th Cir. 2004) (holding that the harmless error analysis applies when, "based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter any other way"); *see also Allen v. Colvin*, 669 F. App'x 497, 498 (10th Cir. 2016) ("Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that

19

correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal. In conducting our review, we should, indeed must, exercise common sense." (quoting *Keyes–Zachary*, 695 F.3d at 1166)).

## II.    The ALJ Properly Evaluated Plaintiff's Subjective Allegations

Plaintiff's next challenge to the ALJ's decision is that the ALJ "failed to show proper evaluation of [Plaintiff's] subjective allegations under the analysis described in *Luna v. Bowen*." Op. Brief at 18.  Plaintiff disagrees with the "ALJ's finding that [he] could perform work on a regular and continuing basis[,]" arguing that the ALJ's assertion "lacks substantial support in the record, and is inconsistent with the treating physician opinions."  Op. Brief at 19.  Plaintiff also rejects the ALJ's recognition of "conservative, medication based treatment" as a basis for disregarding subjective reports.  *Id.* at 18.

In *Luna*, the Tenth Circuit recognized that "subjective" evidence of pain must be properly evaluated by the ALJ.  834 F.2d at 165–166.  A regulation also explicitly states that "subjective" evidence "will be taken into account."  20 C.F.R. § 404.1529(3).  Several factors the ALJ should consider regarding subjective reports are listed in that regulation.  *Id.*  However, the Tenth Circuit "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility."  *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009).

The ALJ did not entirely disregard Plaintiff's subjective complaints; in fact, the ALJ noted that "there is evidence consistent with the claimant's [subjective] allegations."  AR 23.  However, the ALJ found "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  AR 20.  First, the ALJ observed that Plaintiff's "psoriasis was under good control with

medication." AR 23. Pointing to evidence in the record, the ALJ noted that "despite significant findings in the claimant's right upper extremity, medication based treatment was repeatedly continued" and that Plaintiff "was doing well with regards to his symptoms on his medication regimen." *Id.* As to the discounting of Plaintiff's subjective complaints when viewed in light of well-controlled symptoms through medication, the Court finds substantial evidence to support the ALJ's decision. *See Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995) (affirming finding of no disability when pain and symptoms were "well-controlled").

Second, the ALJ cites numerous instances in the record of Plaintiff's daily activities as inconsistent with his subjective complaints. Among these, the ALJ notes that Plaintiff stopped taking medication for diabetes mellitus because he was riding his motorcycle in August 2014 (AR 329), cleaned tiles in April 2016 (AR 472), helped someone move (AR 798), and lifted wood (AR 877). Additionally, the ALJ pointed to Plaintiff's work activity as inconsistent with Plaintiff's subjective allegations, including performing daily construction (AR 788, 796), working as a full time maintenance technician (AR 829), assisting with plumbing work (AR 871), and remaining active in construction in December 2017 (875). Plaintiff argues that "an ability to perform some range of work does not necessarily mean that [he] could perform the sustained requirements of a job on a regular and continuing basis." Op. Brief at 19 (citing *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007)). Plaintiff may be correct in that assertion, but the issue is whether Plaintiff's work history (while claiming disability) can be used as evidence to give less weight to Plaintiff's subjective complaints. Plaintiff does not cite to any case holding that the ALJ is precluded from doing so. Accordingly, the Court finds the ALJ's evaluation of this evidence proper. *See Shepherd v. Apfel*, 184 F.3d 1196, 1202 (10th Cir. 1999) (finding that evidence showing a

claimant conducted mechanic work after the alleged onset of disability supported ALJ's finding of nondisability).

"The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence." *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) (citing *Clifton v. Chater*, 79 F.3d at 1007, 1009–10 (10th Cir.1996) (holding the "record must demonstrate that the ALJ considered all of the evidence," and the ALJ must "discuss[ ] the evidence supporting his decision, . . . the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects")). "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Romero v. Colvin*, 563 F. App'x 618, 620 (10th Cir. 2014) (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010)). Given the totality of the record, the Court finds the ALJ's decision to discount (but not disregard) Plaintiff's subjective allegations closely and affirmatively linked to substantial evidence.

### III.    Step Five Burden Met (Substantial Evidence)

Plaintiff's final challenge is essentially that Plaintiff could not perform the jobs identified by the ALJ.  Op. Brief at 20–21.  Thus, the Court must determine if substantial evidence exists to support the VE's determination that Plaintiff could work as a "furniture rental consultant," "cashier II," and "routing clerk."  AR 65–66.

"[T]he 'substantial evidence' standard is an appellate standard of review which requires a reviewing court to defer to agency factual findings if they are supported by substantial evidence. *Yzaguirre v. Barnhart*, 58 F. App'x 460, 462 (10th Cir. 2003) (citing 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .")).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is

not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin*, 365 F.3d at 1214 (citations omitted). The Court must "not reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007)). The ALJ is not required to "discuss every piece of evidence." *Id.* at 1067 (citing *Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007)).

The ALJ issued a nearly fifteen-page decision, several pages of which summarize Plaintiff's testimony and medical history. *See Wall*, 561 F.3d at 1061. He properly followed the five-step process for adjudicating a disability claim. AR 15–24. The ALJ found, *inter alia*, Plaintiff's psoriasis with psoriatic arthritis mutilans, rotator cuff tendinopathy, mild acromioclavicular osteoarthritis and juvenile rheumatoid arthritis of the right shoulder, and thoracic outlet syndrome to be severe; explained his reasons for finding certain other impairments non-severe; and identified why the severe impairments did not meet or medically equal the impairments listed in the statute. AR 14–19. He crafted a residual functional capacity from the testimony, documents, and medical evidence and explained how each limitation related to Plaintiff's impairments. AR 23–25. He considered all medical opinions provided in this case and gave reasons for the weight he assigned to them. AR 15–23; *see also Vigil v. Colvin*, 805 F.3d 1199, 1201–02 (10th Cir. 2015) (quoting *Keyes–Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("An ALJ must 'give consideration to all the medical opinions in the record [and] discuss the weight he assigns to such opinions.'")). The Court finds that Plaintiff has failed to demonstrate that the ALJ's decision is not supported by substantial evidence, including the residual functional

capacity.  Therefore, the Court finds the ALJ properly considered relevant evidence in the record, including both testimony and documents, in rendering his opinion.

## **CONCLUSION**

In sum, the Court concludes that the ALJ properly considered all relevant evidence in the record and his decision was supported by substantial evidence.  Accordingly, the decision of the ALJ that Plaintiff was not disabled (as defined by the SSA) since April 1, 2012 is AFFIRMED.

SO ORDERED.

Dated this 5th day of November, 2020, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge